NOT RECOMMENDED FOR PUBLICATION
File Name: 24a0118n.06

No. 23-5112

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Mar 13, 2024
KELLY L. STEPHENS, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff-Appellee, | ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF KENTUCKY |
| v. | ) | |
| JUSTIN BRYANT, | ) | |
| Defendant-Appellant. | ) | OPINION |

Before: BATCHELDER, MOORE, and CLAY, Circuit Judges.

**KAREN NELSON MOORE, Circuit Judge.**   This case addresses Justin Bryant's ("Bryant") appeal from his sentence of life in prison.  Bryant, along with John Holbrooks ("Holbrooks"), purchased what they believed to be heroin on October 12, 2021 before being pulled over, arrested, and brought to Pike County Detention Center.  There, Bryant negotiated with another individual, Jayshawn Robinson ("Robinson"), to exchange drugs that he had brought into the prison for Robinson's putting money on his and Holbrooks's accounts to enable them to bond out.  Robinson gave Bryant sufficient funds to bond out (although Robinson was unable to put the full amount of Holbrooks's bond on Holbrooks's account), and Bryant left the detention pod on October 12, 2021.  While Bryant was still in prison, an inmate put up a sheet over the bathroom door, and Bryant was observed going into the covered bathroom with numerous other individuals in their pod.  Holbrooks and Robinson testified that Bryant was using what they believed to be heroin with other inmates in the bathroom.  Shortly after Bryant bonded out, another inmate, James

No. 23-5112, *United States v. Bryant*

"Youngin" Cornett ("Cornett"), was found unresponsive in the pod and ultimately died after several days on life support. Cornett's blood tested positive for fentanyl and para-fluorofentanyl. A federal jury convicted Bryant of Conspiracy to Distribute Heroin, Fentanyl, and Para-Fluorofentanyl and of Distribution of Fentanyl and Para-Fluorofentanyl, the use of which resulted in the death of another person. Based on Bryant's PSR and the Sentencing Guidelines, the district court sentenced Bryant to life in prison. Bryant timely appeals.

## I. BACKGROUND

On October 12, 2021, Bryant, along with Holbrooks,[1] decided to go to a house in Island Creek, Pike County, Kentucky, where they "picked up some heroin." R. 126 (Trial Tr. at 21) (Holbrooks Direct) (Page ID #882). Bryant went into the house while Holbrooks waited in the car. *Id.* The two had "put [their] money together" to purchase "seven grams or so" of heroin. *Id.* at 22 (Holbrooks Direct) (Page ID #883). Holbrooks testified that he would use about a tenth of a gram at a time, meaning that Bryant and Holbrooks had purchased about seventy doses worth of heroin. *Id.* at 24–25 (Holbrooks Direct) (Page ID #885–86). According to Holbrooks, they were getting the heroin partially for personal use and partially "to get rid of it." *Id.* at 25 (Holbrooks Direct) (Page ID #886).

After Bryant went into the house and purchased the heroin, he and Holbrooks went to Fill Zone, a gas station. Bryant went inside and "stayed in there [for] about an hour or so" while Holbrooks waited for him in the car. *Id.* at 23 (Holbrooks Direct) (Page ID #884). Holbrooks

---

[1]Holbrooks's plea agreement required him to "help [the government] investigate and prosecute other people" in order to get credit for "assisting the government." R. 126 (Trial Tr. at 35) (Holbrooks Cross) (Page ID #896).

No. 23-5112, *United States v. Bryant*

went into the Fill Zone once, to see if Bryant was ready to go.  *Id.* at 24 (Holbrooks Direct) (Page ID #885).  Eventually, Bryant "bought some stuff" from the gas station, and the two left, with Holbrooks driving.  *Id.*  "As soon as [Holbrooks] pulled out on the road," they were pulled over by training officer Officer Daniel Fields ("Fields") and a new officer, Officer Thacker ("Thacker").  *Id.* at 3, 24 (Fields Direct, Holbrooks Direct) (Page ID #864, 885).  When Thacker turned on the emergency lights, Holbrooks continued to drive at a slow rate down the highway for some time before pulling over.  *Id.* at 3–4 (Fields Direct) (Page ID #864–65).  Fields observed the "passenger of the vehicle [Bryant] moving around a lot," which Fields did not view as "normal when conducting a traffic stop."  *Id.* at 4 (Fields Direct) (Page ID #865–66).

When Fields went to the vehicle's passenger side, he "observed . . . two large fixed blade knives" near Bryant's left hand, along with "a small, clear container, contain[ing] a gray, white powder substance" in Bryant's lap.  *Id.* at 5 (Fields Direct) (Page ID #866).  Fields testified that based on his "training and experience," he believed the "gray and white powder substance" he observed in Bryant's lap to be heroin.  *Id.* at 6 (Fields Direct) (Page ID #867).  At this point, Fields told Bryant to exit the car and informed Bryant that he was under arrest.  *Id.*  When Bryant got out of the car, Fields testified that Bryant "immediately kind of reached for his waistband area," and that Fields "secured [Bryant's] left hand and used [Fields's] other hand to push [Bryant] up against the vehicle."  *Id.* at 13 (Fields Cross) (Page ID #874).  Once Fields had handcuffed and searched Bryant, Fields also found a "crystalline substance . . . wrapped in aluminum foil in the passenger side of the vehicle."  *Id.* at 6 (Fields Direct) (Page ID #867).  Fields seized the items and sent them

3

No. 23-5112, *United States v. Bryant*

to the Kentucky State Police ("KSP") to be tested. *Id.* at 8 (Fields Direct) (Page ID #869).[2]  He also conducted a search incident to Bryant's arrest but did not strip search Bryant or "look inside any body cavities." *Id.* at 10 (Fields Direct) (Page ID #871).  Fields did not find any drugs on Bryant's person when conducting the search. *Id.* at 14 (Fields Cross) (Page ID #875).  Bryant was charged with "possession of a controlled substance first" for both heroin and methamphetamine. *Id.* at 10 (Fields Direct) (Page ID #871).  Holbrooks was also arrested and charged on a DUI charge, as well as for possession of "whatever . . . was laying in the vehicle."[3]  *Id.* at 26 (Holbrooks Direct) (Page ID #887).

In the "early morning hours" of October 12, Bryant was sent to Pike County Detention Center. *Id.* at 9 (Fields Direct) (Page ID #870).  Holbrooks was first taken to Pikeville Medical Center before ultimately being "transported to the Pike County Detention Center." *Id.* at 11 (Fields Cross) (Page ID #872).  Bryant and Holbrooks were both strip searched and placed in the same holding cell before being moved to a quarantine cell, Pod 16, which held approximately twelve to fourteen other people. *Id.* at 36–37 (Holbrooks Cross) (Page ID #897–98).  Neither Holbrooks nor Bryant was cavity searched or X-rayed. *Id.* at 36 (Holbrooks Cross) (Page ID #897); *see also* R. 127 (Trial Tr. at 34–35) (Wood Redirect) (Page ID #998–99).  Holbrooks testified that while they were in Pod 16, he and Bryant had "done a line" of heroin in the bathroom, and that Bryant had

---

[2]The parties stipulated to the fact that the "off-white powder" was tested and that the KSP laboratory "found it to contain heroin . . . ; fentanyl . . . ; and methamphetamine"; and to the fact that the "crystalline substance" was tested and that the KSP laboratory "found it to contain methamphetamine." *Id.* at 18 (Page ID #879); *see also* R. 86 (Stipulated Facts ¶ 3) (Page ID #204).

[3]Fields testified that he cannot recall "all the charges" that Holbrooks was actually charged with. *Id.* at 15 (Fields Cross) (Page ID #876).

No. 23-5112, *United States v. Bryant*

"give[n] some of it to [Holbrooks]."  R. 126 (Trial Tr. at 28) (Holbrooks Direct) (Page ID #889). Pod 16 had only one bathroom area, where the communal toilets, shower, and sinks were all located.  *Id.* at 37 (Holbrooks Cross) (Page ID #898).  Holbrooks also testified that he was not the only person to take heroin in the bathroom, and that there were "three or four more" individuals from Pod 16 who entered the bathroom and "done a line."  *Id.* at 28 (Holbrooks Direct) (Page ID #889).  Although Holbrooks did not know for certain where the heroin had come from, he testified at trial that he "kind of figured" that Bryant had brought it into the cell.  *Id.* at 29 (Holbrooks Direct) (Page ID #890).

Robinson,[4] a fellow inmate in Pod 16 who is in prison for conspiracy to distribute over 500 grams of methamphetamine, testified that Bryant had brought heroin into the jail that Robinson "wanted to buy."  *Id.* at 42 (Robinson Direct) (Page ID #903).  Robinson stated that prior to Bryant's arrival in Pod 16, there was no "heroin available for purchase" in Pod 16 and that he did not "see any heroin inside of Pod 16."  *Id.* at 42–43 (Robinson Direct) (Page ID #903–04).  When Bryant arrived in Pod 16, Robinson testified that "everyone . . . surrounded him" and "hugged up on him like they was waiting on something."  *Id.* at 43 (Robinson Direct) (Page ID #904).

According to Robinson, after sitting on a bed and talking with others in Pod 16 for around ten minutes, Bryant went into the bathroom, where he stayed for "like an hour or so."  *Id.*  At 4:37 p.m. on October 12, Bryant went into the restroom and another inmate, Toby Newsome, "covered the doorway with a sheet."  R. 127 (Trial Tr. at 107) (Fields Direct) (Page ID #1071).  About an hour later, Holbrooks entered the bathroom, which Bryant had not exited yet.  *Id.* at 111 (Fields

---

[4]Robinson testified at Bryant's trial with the hope that doing so would result in a lower sentence.  *Id.* at 41 (Robinson Direct) (Page ID #902).

No. 23-5112, *United States v. Bryant*

Direct) (Page ID #1075).  When Robinson walked in, Bryant was "doing nothing but sitting on the toilet," but when Robinson went to walk back to his bed, he claims that Bryant and another person were "doing lines on the Chirp [the in-jail phone inmates can use for messaging]."  R. 126 (Trial Tr. at 44) (Robinson Direct) (Page ID #905).  After that, Robinson testified that "everybody went over there, and they all started doing lines" in the bathroom area.  *Id.*  Bryant was the "only one" that Robinson observed with the heroin.  *Id.*  At around 5 p.m., both Bryant and Holbrooks exited the bathroom.  R. 127 (Trial Tr. at 111) (Fields Direct) (Page ID #1075).  At 5:10 p.m., Bryant and Cornett entered the restroom together.  *Id.* at 112 (Fields Direct) (Page ID #1076).  At 5:43 p.m., Bryant returned to the restroom, at which point an inmate named "Lamenko" had put the sheet back up.  *Id.* at 117 (Fields Direct) (Page ID #1081).[5]  From 5:50 p.m. to 6:02 p.m., Holbrooks was in the bathroom, during which time "at least four different inmates" entered the bathroom with him.  *Id.* at 142–43 (Fields Cross) (Page ID #1106–07).  At around 6:11 p.m., Cornett entered the bathroom area with two other inmates.  *Id.* at 143–44 (Fields Cross) (Page ID #1107–08).

At some point after Bryant had been observed entering and exiting the bathroom, Bryant and Robinson had a conversation on Robinson's bed, during which Robinson asked Bryant how much heroin he had on him.  R. 126 (Trial Tr. at 49) (Robinson Direct) (Page ID #910).  Bryant pulled out a Ziploc bag and showed it to Robinson.  *Id.*  When Robinson asked what Bryant wanted for it, Bryant told him to "[b]uy [him] and [his] friend [Holbrooks] out."  *Id.*  Robinson then got on the phone with his ex-girlfriend, KeAira Houston ("Houston"), and told her to put money on

_____

[5]The trial testimony states that when Bryant returned to the restroom, an inmate named Lamenko had put "the curtain back up," but does not state exactly when or by whom the sheet was taken down during this timeframe.  R. 127 (Trial Tr. at 116–17) (Fields Direct) (Page ID #1080–81).

No. 23-5112, *United States v. Bryant*

both Bryant's and Holbrooks's books. *Id.* at 50 (Robinson Direct) (Page ID #911). Bryant ultimately received the $400 required for him to make bail, and, in exchange, he gave the baggie of heroin to Robinson. *Id.* at 52 (Robinson Direct) (Page ID #913). Robinson's intent was to sell the heroin within the jail. *Id.* He also testified that he intended to "stretch it" by adding "Tylenol or something to it" in order to weaken the heroin, because he had observed that it was strong. *Id.* at 53 (Robinson Direct) (Page ID #914). Houston also attempted to put $600 on Holbrooks's account for Holbrooks to bond out as well, but she was unable to put more than $500 on Holbrooks's book per day. *Id.* at 57 (Robinson Direct) (Page ID #918). Robinson put the $500 on, and instructed Houston to try the other $100 when the time limit expired. *Id.* at 58 (Robinson Direct) (Page ID #919). Robinson testified that he put the heroin in a "jar of hair grease" and threw the jar under the sink in the common bathroom area, to which everyone in Pod 16 had access. *Id.*

After Robinson put the money on Bryant's account, Bryant bonded out of the prison on October 12, 2021. *Id.* at 38 (Holbrooks Cross) (Page ID #899). Before he left, Bryant told Holbrooks that "he had money put on [Bryant's] books and [Holbrooks's] books to get [them] out." *Id.* at 30 (Holbrooks Direct) (Page ID #891). Upon leaving Pod 16, Bryant gave Holbrooks "a couple tenths or something" of heroin, which Holbrooks "did." *Id.* at 32 (Holbrooks Direct) (Page ID #893). Holbrooks testified that he did not see Bryant with any more heroin other than what he gave to Holbrooks and what he had in the bathroom. *Id.* Holbrooks observed people going in and out of the bathroom but did not see what they were doing in the bathroom "with [his] own eyes," *id.* at 28, 32 (Holbrooks Direct) (Page ID #889, 893), nor did he ask Bryant how Bryant

No. 23-5112, *United States v. Bryant*

got the heroin that he gave to Holbrooks upon leaving, *id.* at 33 (Holbrooks Direct) (Page ID #894). Robinson also remained in Pod 16. *Id.* at 60 (Robinson Direct) (Page ID #921).

The night after Bryant left Pod 16, Cornett was perceived to be sleeping in his bed. *Id.* at 45, 67 (Robinson Direct, Cross) (Page ID #906, 928).[6] After the other individuals in Pod 16 tried and failed to wake Cornett up, they got the attention of the correctional officers ("COs"), who came into Pod 16 to get Cornett out. *Id.* at 67 (Robinson Cross) (Page ID #928). Kimberly Stump ("Stump"), a nurse at Pike County Detention Center, testified that Cornett was "unresponsive and not breathing" when she arrived at Pod 16. R. 127 (Trial Tr. at 22) (Stump Direct) (Page ID #986). She called for EMS and applied an automated external defibrillator to Cornett but was unable to get a pulse from Cornett. *Id.* Cornett eventually started to breathe a little bit and EMS administered a dose of Narcan, which "reverses the effect of opioid overdose." *Id.* EMS then took Cornett to Pikeville Medical Center. *Id.* at 23 (Stump Direct) (Page ID #987). Stump also testified that on the day before, October 12, Cornett came to her office and said that he was on blood pressure medication at the Letcher County Detention Center. *Id.* Pike County Detention Center had not received his medication yet, and Cornett's relatively normal blood pressure (130 over 80) was not at the level where Stump could administer blood pressure medication without having his medication list. *Id.* at 23–24 (Stump Direct) (Page ID #987–88).

After the COs had removed Cornett, but before they removed everyone else from Pod 16, Robinson testified that one of the other inmates found some drugs right near Cornett's bunk and swallowed them. R. 126 (Trial Tr. at 68) (Robinson Cross) (Page ID #929). Robinson also stated

---

[6]Cornett suffered from heart problems, low blood sugar, and high blood pressure. R. 127 (Trial Tr. at 13–14) (Lindsey Cross) (Page ID #977–78).

No. 23-5112, *United States v. Bryant*

that the drugs the other inmate found "looked like the same stuff [that he had bought from Bryant]." *Id.* at 72 (Robinson Redirect) (Page ID #933).  When everyone returned to the pod, Robinson gave the inmate who swallowed the drugs some shampoo to help get them out of his stomach.  *Id.* at 69 (Robinson Cross) (Page ID #930).  When the other inmate vomited up the drugs, Robinson testified that they were "wet" and that he "[c]ouldn't do nothing with it," so the other inmate flushed the drugs.  *Id.*

In the aftermath of Cornett's removal from Pod 16, Drug Enforcement Administration ("DEA") Agent Douglas Dalrymple ("Dalrymple") interviewed Bryant and Holbrooks, among other individuals.  R. 126 (Trial Tr. at 76) (Dalrymple Direct) (Page ID #937).  Bryant told Dalrymple that "Holbrooks had brought some heroin into the cell in his body cavity" and that "Bryant had negotiated a transaction with [] Robinson" to exchange the drugs for money for both Bryant and Holbrooks to post bond.  *Id.* at 78 (Dalrymple Direct) (Page ID #939).  Dalrymple also testified that in his experience, heroin and fentanyl are often "mixed together to try and maximize [] profits."  *Id.* at 87 (Dalrymple Direct) (Page ID #948).

Cornett was on life support for several days at Pikeville Medical Center before he died on October 20, 2021.  *Id.* at 79 (Dalrymple Direct) (Page ID #940).  Someone had drawn Cornett's blood when he arrived at the center, which Dalrymple subpoenaed and sent to the KPS Crime Lab.  *Id.* at 80 (Dalrymple Direct) (Page ID #941).  NMS Labs, a private forensic toxicology company, conducted testing on Cornett's blood samples.  R. 127 (Trial Tr. at 36) (Schroder Direct) (Page ID #1000). William Schroeder ("Schroeder"), a forensic toxicologist at NMS Labs, testified that both samples had been collected from Cornett at 1:05 a.m. on October 14, 2021.  *Id.* at 41 (Schroeder Direct) (Page ID #1005).  He stated that fentanyl was detected in Cornett's blood samples, at 3.4

9

No. 23-5112, *United States v. Bryant*

nanograms per milliliter. *Id.* at 47 (Schroeder Direct) (Page ID #1011). There was also 4-ANPP, which is a "precursor for fentanyl production," at 1.4 nanograms per milliliter. *Id.* The lab also found 1.1 nanograms per milliliter of para-Fluorofentanyl, which is a "non-prescription synthetic opioid that's commonly used in the recreational drug market" and is "similar structurally to fentanyl and acetyl-fentanyl," in Cornett's blood. *Id.* at 50–51 (Schroeder Direct) (Page ID #1014–15). The testing did not detect any heroin, which Schroeder indicated was to be expected because "heroin breaks down very quickly in the body." *Id.* at 54 (Schroeder Cross) (Page ID #1018). There was also an unconfirmed indication of a very low level of morphine in the blood. *Id.* at 59 (Schroeder Redirect) (Page ID #1023).

Dr. Meredith Frame ("Frame"), the state medical examiner who conducted Cornett's autopsy, testified that in her opinion, Cornett "died of complications of the acute combined toxic events of para-Fluorofentanyl and fentanyl." *Id.* at 72 (Frame Direct) (Page ID #1036). When Frame reviewed the toxicology report, the levels "[a]bsolutely" gave her cause for concern. *Id.* at 73 (Frame Direct) (Page ID #1037). Cornett suffered an anoxic brain injury because the cells in his brain "didn't get enough oxygen in that time period while his heart wasn't working." *Id.* at 74 (Frame Direct) (Page ID #1038). Frame testified that this corresponds with the presence of fentanyl and para-Fluorofentanyl, because these drugs "slow your respirations until . . . you go unresponsive and into cardiac arrest," which "would be the initiating event" for a death like Cornett's. *Id.* at 74–75 (Frame Direct) (Page ID #1038–39). At the time of his death, Cornett also had pneumonia, which Frame testified was not abnormal in someone who was on respiratory support for several days. *Id.* at 76 (Frame Direct) (Page ID #1040). Overall, Frame testified that

10

No. 23-5112, *United States v. Bryant*

her opinion that Cornett would not have died had he not had fentanyl and para-Fluorofentanyl in his system.  *Id.* at 78 (Frame Cross) (Page ID #1042).

After a trial, a jury convicted Bryant of:  (1) Count One, Conspiracy to Distribute Heroin, Fentanyl, and Para-Fluorofentanyl, in violation of 21 U.S.C. § 846; and (2) Count Two, Distribution of Fentanyl and Para-Fluorofentanyl, the use of which resulted in the death of another person, in violation of 21 U.S.C. § 841(a)(1).  R. 117 (Judgment at 1) (Page ID #725).  Bryant's Presentence Investigative Report ("PSR") calculated his base offense level to be 43, pursuant to U.S.S.G. § 2D1.1, which imposes the maximum offense level upon defendants who are convicted under 21 U.S.C. § 841(b)(1)(C) when the "offense of the conviction establishes that death or serious bodily injury resulted from the use of the substance" and that defendant has "one or more prior convictions for a similar offense."  R. 114 (PSR at ¶ 66) (Page ID #687).

At sentencing, the district court noted that Bryant had prior convictions, including "trafficking first charge relating to the sale of methamphetamine," R. 125 (Sent'g Tr. at 66) (Page ID #813), and considered additional testimonial evidence from Dalrymple regarding another overdose death on August 7, 2021, *id.* at 20–35 (Dalrymple Direct) (Page ID #767–82).  Dalrymple stated that Bryant was listed as having delivered drugs to the deceased, Ralph Caldwell ("Caldwell").  *Id.* at 20 (Dalrymple Direct) (Page ID #767).  Dalrymple also testified that on October 15, 2021, Bryant returned to Pike County Detention Center, either to visit or leave money for somebody, and that staff found controlled substances in his sock during this visit and arrested him.  *Id.* at 28–29 (Dalrymple Direct) (Page ID #775–76).  After testing, the lab determined that the substances were found to contain heroin, fentanyl, and methamphetamine.  *Id.* at 31 (Dalrymple Direct) (Page ID #778).  Dalrymple further testified that Bryant had an additional run-in with the

No. 23-5112, *United States v. Bryant*

Pikeville Police Department on November 10, 2021, when, while executing an arrest warrant, officers found substances that contained heroin, fentanyl, and methamphetamine in the room where Bryant was arrested. *Id.* at 32–35 (Dalrymple Direct) (Page ID #779–82). When Bryant was processed at the jail, a small baggie of drugs fell from his pant leg. *Id.* at 34 (Dalrymple Direct) (Page ID #781).

Bryant's PSR calculated a base offense level of 43, to which 2 levels were added because the "object of the offense was the distribution of a controlled substance in a prison." R. 114 (PSR ¶¶ 66–67) (Page ID #687). The Sentencing Guidelines provide that when a "total offense level is calculated in excess of 43, the offense level . . . be treated as a level 43." *Id.* ¶ 74 (Page ID #688). The district court considered this guideline offense level of 43, as well as Bryant's "individual criminal history," when sentencing Bryant to life imprisonment. R. 125 (Sent'g Tr. at 56, 107) (Page ID #803, 854). In reaching its sentencing decision, the district judge noted that it had to take into account restitution for Cornett's family, *id.* at 61 (Page ID #808); the fact that Bryant had "year after year convictions," *id.* at 93 (Page ID #840); the "[shocking] [f]lagrancy of [the] crime," *id.* at 94 (Page ID #841); what would satisfy deterrence interests, *id.* at 95 (Page ID #842); what would protect the community from Bryant's "criminal lifestyle," *id.* at 96 (Page ID #843); the "nature and circumstances of the offense," *id.* at 99 (Page ID #846); and Bryant's history and characteristics, which included "[a]t least three felonies" and a "troubling pattern" of re-offense, *id.* at 100 (Page ID #847). The district court also noted that the Sentencing Guidelines did not bind it to impose a life term and stated that it had considered the mitigating factors like the "trauma of [Bryant's] brother" and Bryant's father's "decision to take his life." *Id.* at 105 (Page ID #852). However, the district court ultimately chose not to deviate below the Sentencing Guidelines

No. 23-5112, *United States v. Bryant*

because Bryant had remained "stubbornly dedicated to criminality" throughout his life.  *Id.* at 105–06 (Page ID #852–53).

On appeal, Bryant claims that:  (1) there was insufficient evidence to support his conviction for "conspiracy to distribute a controlled substance, leading to death"; (2) that his conviction for trafficking methamphetamine ("Trafficking in a Controlled Substance (2nd Degree)") does not qualify as a "prior 'similar offense'" for the purposes of an increased offense level when his current conviction involved distributing fentanyl; and (3) that "the district court rendered a substantively unreasonable sentence."  Appellant Br. at 3.

## II.  DISCUSSION

### A.  Standard of Review

We review de novo challenges to the sufficiency of evidence.  *United States v. Ray*, 803 F.3d 244, 262 (6th Cir. 2015).  When we are reviewing jury decisions, though, "we view the evidence in the light most favorable to the government and give the government the benefit of all reasonable inferences from the testimony."  *Id.*  We do "not 'weigh the evidence, consider the credibility of witnesses or substitute our judgment for that of the jury.'"  *Id.* (quoting *United States v. Hilliard*, 11 F.3d 618, 620 (6th Cir. 1993)).

We review a district court's sentencing decisions for procedural and substantive reasonableness under an abuse-of-discretion standard.  *United States v. Walls*, 546 F.3d 728, 736 (6th Cir. 2008).  Several circumstances may make an imposed sentence procedurally unreasonable, including if the district court "failed to calculate the Guidelines range properly; treated the Guidelines as mandatory; failed to consider the factors prescribed at 18 U.S.C. § 3553(a); based the sentence on clearly erroneous facts; or failed to adequately explain the sentence."  *United States*

13

No. 23-5112, *United States v. Bryant*

*v. Coppenger*, 775 F.3d 799, 803 (6th Cir. 2015).  "'A sentence is substantively unreasonable if the district court select[s] the sentence arbitrarily, bas[es] the sentence on impermissible factors, fail[s] to consider pertinent [] factors or giv[es] an unreasonable amount of weight to any pertinent factor.'"  *Walls*, 546 F.3d at 736 (quoting *United States v. Caver*, 470 F.3d 220, 248 (6th Cir. 2006)).  We presume that a sentence that is within the "properly calculated guidelines range" is reasonable.  *Id.*  Whether we would have concluded that a different sentence was reasonable is insufficient to justify reversing the district court's sentencing decision.  *Id.*

**B. There was sufficient evidence to support Bryant's conviction for conspiracy to distribute a controlled substance, leading to death.**

Pursuant to 21 U.S.C. § 841(a)(1), it is unlawful to "manufacture, distribute, or dispense" a controlled substance.  21 U.S.C. § 841(a)(1).  "[I]f death . . . results from the use of such [controlled] substance," Congress authorizes a sentence of "a term of imprisonment of not less than twenty years or more than life." 21 U.S.C. § 841(b)(1)(C).  The jury instructions for Count 2 in this case required the jury to find but-for causation, R. 87 (Jury Instructions at 18–19) (Page ID #223–24), meaning that the government must show beyond a reasonable doubt that the death in question "would not have occurred 'without the incremental effect' of the controlled substance.'" *United States v. Sadler*, 24 F.4th 515, 545 (6th Cir. 2022) (quoting *United States v. Volkman*, 797 F.3d 377, 392 (6th Cir. 2015)).  But-for causation does not require a finding that the Defendant personally handed the drugs to the deceased, but "requires the government to prove only that the specific drug underlying a defendant's violation of § 841(a) is the same drug that was the but-for cause of the victim's death." *Id.* at 545–46 (quoting *United States v. Davis*, 970 F.3d 650, 656 (6th Cir. 2020)).  The full jury instructions dictated that for the jury to find Bryant guilty, they had to find beyond a reasonable doubt that:  (1) Bryant "knowingly distributed a mixture or substance

14

No. 23-5112, *United States v. Bryant*

containing a detectable amount of fentanyl and/or a detectable amount of para-fluorofentanyl"; (2) Bryant "knew at the time of distribution that what he distributed contained a controlled substance"; (3) Cornett "died as a result of his use of such controlled substances distributed by [] Bryant"; and (4) Bryant was "part of the distribution chain that placed the mixture or substance containing a detectible amount of fentanyl and/or . . . para-fluorofentanyl into the hands of [] Cornett." R. 87 (Jury Instructions at 18) (Page ID #223). The causation inquiry here involves two questions: (1) whether Cornett consumed drugs that were, at some point, distributed by Bryant; and (2) whether those drugs were the but-for cause of Cornett's overdose death. *Sadler*, 24 F.4th at 546. The death must have resulted from the "use of the unlawfully distributed drug" only, rather than "from a combination of factors to which drug use merely contributed." *Burrage v. United States*, 571 U.S. 204, 216 (2014).

Bryant argues on appeal that a reasonable juror could not fairly tie him to the overdose death of Cornett beyond a reasonable doubt. To do so, Bryant highlights several variables that he contends break the causal chain: (1) the attenuated timeframe, during which Bryant bonded out of Pod 16; (2) a later search of Pod 16 revealed "multiple items of contraband" and "failed to uncover additional controlled substances that had been swallowed by another inmate"; and (3) Robinson admitted that he intended to alter the drugs by adding Tylenol or some other substance to the substance that he purchased from Bryant. Appellant Br. at 16. Bryant also inaccurately claims that the parties stipulated the presence of methamphetamine in the shared bathroom. *Id.* A review of the Stipulated Facts in question shows that the stipulated facts are referring to the substances that were found on Bryant during the traffic stop, R. 86 (Stipulated Facts ¶ 3) (Page ID #204), and what was found in the pomade can that Robinson stashed in the bathroom, *id.* ¶ 2 (Page ID #204),

No. 23-5112, *United States v. Bryant*

both of which a reasonable fact finder could tie back to Bryant.[7]   He also challenges the government's use of a witness (Robinson) who is a "large-scale drug dealer."  Appellant Br. at 15.  However, given our deferential stance toward jury trials, we do not consider the credibility of the government's witnesses at this point.  *Ray*, 803 F.3d at 262.

Based on the available evidence, and keeping in mind the deferential standard by which we are bound when reviewing jury decisions, we conclude that there is sufficient evidence that a reasonable trier of fact could have found beyond a reasonable doubt that Bryant was involved in the distribution chain that led to Cornett ingesting controlled substances and subsequently dying.  Holbrooks testified that he and Bryant pooled their resources to purchase seven grams (or seventy "doses") of heroin, that Bryant subsequently spent an hour in a gas station, and that Bryant had brought at least some of the controlled substance into Pod 16.   R. 126 (Trial Tr. at 22–25) (Holbrooks Direct) (Page ID #883–86).  Video surveillance from Pod 16 showed that Bryant was in Pod 16's shared bathroom with a sheet covering the doorway for a significant amount of time and that numerous inmates, including Cornett, entered the bathroom with Bryant.  Robinson testified that he observed Bryant "doing lines" with other inmates, that he negotiated with Bryant to purchase heroin from Bryant in exchange for funds to bond Bryant and Holbrooks out, and that the substance that Robinson later observed near Cornett's bunk looked like the substance that Robinson had purchased from Bryant.  It is irrelevant whether Bryant had bonded out by the time

---

[7]Contrary to Bryant's representations on appeal, the stipulation does not state that "a quantity of methamphetamine was also located within [Pod 16's] shared bathroom," but rather that the drugs seized during the traffic stop contained methamphetamine.  Appellant Br. at 16.  In fact, there was no evidence presented at trial that methamphetamine was ever found within Pod 16.

No. 23-5112, *United States v. Bryant*

Cornett died; the relevant inquiry here is whether Bryant had provided the drugs that ultimately caused Cornett's death.

Bryant and Holbrooks may have thought that what they were purchasing was heroin, but Dalrymple testified that it was not uncommon for producers to mix fentanyl and heroin together. In fact, the stipulated facts show that the substances Bryant was found with during the traffic stop (which amounted to 1.259 grams, a significantly lower amount than what Holbrooks testified they purchased) did, in fact contain heroin as well as fentanyl.  R. 86 (Stipulated Facts ¶ 3) (Page ID #204).  And fentanyl was also found in Cornett's blood samples.  R. 127 (Trial Tr. at 47, 51) (Schroeder Direct) (Page ID #1011, 1015).  Even though Bryant and Holbrooks may have intended to purchase heroin, not fentanyl, our precedent dictates that even if they did not know that the contraband was laced with fentanyl, it was sufficient that Bryant "was aware that he was purchasing controlled substances."  *See United States v. Williams*, 998 F.3d 716, 730 (6th Cir. 2021) (citing *United States v. Villarce*, 323 F.3d 435, 439 & n.1 (6th Cir. 2003)).  Further, there is no real dispute that Bryant sold drugs to Robinson.  And although Robinson testified that he had intended to add Tylenol or some other substance to the drugs he purchased from Bryant in order "to stretch it" or "weaken it," R. 126 (Trial Tr. at 53) (Robinson Direct) (Page ID #914), there is no evidence that Robinson actually did so prior to Cornett's ingestion of the drugs.  Sufficient evidence existed for a reasonable trier of fact to find beyond a reasonable doubt that Bryant was involved in distributing the drugs that Cornett consumed and that caused his death.

The second part of our but-for inquiry is fairly straightforward.  According to the lab reports, Cornett had fentanyl and para-fluorofentanyl in his system.  R. 127 (Trial Tr. at 47, 51) (Schroeder Direct) (Page ID #1011, 1015).  Frame, the medical examiner, testified that she had

No. 23-5112, *United States v. Bryant*

reviewed the toxicology report and that the drug levels in the blood "absolutely" gave her concern because "[t]hey are lethal." *Id.* at 73 (Frame Direct) (Page ID #1037). Cornett died on October 20, 2021, following several days on life support after he was discovered unconscious on October 13, 2021. Frame testified that Cornett had suffered an "anoxic brain injury" caused by a lack of oxygen flow to his brain when he went into cardiac arrest. *Id.* at 74 (Frame Direct) (Page ID #1038). This type of injury has a relationship to the presence of fentanyl and para-fluorofentanyl because the effect of these drugs can slow one's respirations until one suffers cardiac arrest. *Id.* at 74–75 (Frame Direct) (Page ID #1038–39). Overall, in Frame's opinion, Cornett "would not have died if the fentanyl and para-Fluorofentanyl would not have been in his blood." *Id.* at 78 (Frame Direct) (Page ID #1042). We affirm the district court's judgment.

## C. Bryant's instant conviction for distributing fentanyl was sufficiently similar to his prior conviction of trafficking methamphetamine under our current precedent.

On appeal, Bryant also argues that his prior conviction for trafficking in a controlled substance should not count as a sufficiently similar offense for purposes of U.S.S.G. § 2D1.1.[8] Section 2D1.1 states that if "[a] defendant is convicted under 21 U.S.C. [§] . . . 841(b)(1)(C) . . . and the offense of conviction establishes that death or serious bodily injury resulted from the use of the substance and that the defendant committed the offense after one or more prior convictions for a similar offense," the base offense level should be calculated at 43. U.S.S.G. § 2D1.1(a)(1) (2021). In *United States v. Johnson*, "we conclude[d] that the Sentencing Commission intended

---

[8]As of the updated 2023 Guidelines (effective November 1, 2023), the language has been updated to "felony drug offense," rather than "similar offense." U.S.S.G. § 2D1.1(a)(1)(B) (2023). Because these guidelines were not in effect at the time of Bryant's sentencing, we rely on the language from the 2021 Guidelines.

No. 23-5112, *United States v. Bryant*

the term 'similar offense' to be synonymous with the term 'felony drug offense.'" 706 F.3d 728, 731 (6th Cir. 2013). A "felony drug offense" is defined as "an offense that is punishable by imprisonment for more than one year under any law of the United States or of a State . . . that prohibits or restricts conduct relating to narcotic drugs, marihuana, anabolic steroids, or depressant or stimulant substances." 21 U.S.C. § 802(44). Bryant's PSR used his conviction for "Trafficking in a Controlled Substance (2nd Degree)" to determine that U.S.S.G. § 2D1.1 set Bryant's base offense level at 43. R. 114 (PSR ¶ 108 and p.41) (Page ID #700, 716–17). At sentencing, the district court noted that Bryant's conviction for "Possession Controlled Substance (1st Degree)," *id.* ¶ 107 (Page ID #699–700), would also count as a "similar offense" for sentencing purposes, R. 125 (Sent'g Tr. at 14–15) (Page ID #761–62).

Bryant points out that the prior convictions that the PSR and the district court relied on both "involved small quantities of methamphetamine." Appellant Br. at 18; *see also* R. 125 (Sent'g Tr. at 12–15) (Page ID #759–62). The district court found that *United States v. Johnson* dictated that Bryant's convictions "fit as similar offenses." R. 125 (Sent'g Tr. at 15) (Page ID #762). At sentencing and on appeal, Bryant argues that the two offenses would have to be "much more similar," R. 125 (Sent'g Tr. at 12) (Page ID #759), and that equating his prior convictions of possessing and trafficking methamphetamine "outside of a custodial setting" to his current conviction of "trafficking fentanyl within a detention center" relies on a "very broad reach of *Johnson*," Appellant Br. at 18. Instead, Bryant argues, a "sliding scale" approach, like the one that the Sentencing Guidelines utilize for analyzing relevant conduct, should apply in evaluating the similarities between prior and current convictions. *Id.* at 18–20.

19

No. 23-5112, *United States v. Bryant*

As Bryant conceded at the sentencing hearing, R. 125 (Sent'g Tr. at 12–13) (Page ID #759–60), we are currently bound by *Johnson*.  Because Bryant's previous convictions for possessing and trafficking methamphetamine were felony drug offenses, *see* R. 114 (PSR ¶¶ 66, 107, 108) (Page ID #687, 699–700),[9] our precedent dictates that they be considered sufficiently "similar offenses," *Johnson*, 706 F.3d at 733; *see also United States v. Stevens*, No. 22-5410, 2023 WL 3200322, at *4 (6th Cir. May 2, 2023).  We affirm the district court's use of *Johnson* and its calculation of Bryant's base level.

**D.  The district court did not render a substantively unreasonable sentence.**

Finally, Bryant argues that the district court imposed a substantively unreasonable sentence when it "failed to properly weigh and consider the factors set forth in 18 U.S.C. § 3553(a)." Appellant Br. at 21.  Specifically, Bryant argues, the district court's sentence was unreasonable because:  (1) it gave "too much weigh to [Bryant's] alleged involvement in an additional overdose case"; (2) it gave "undue weight to the number of [Bryant's] prior convictions"; and (3) Bryant's sentence was "far more severe" than that of his co-defendants (Robinson and Holbrooks). Appellant Br. at 21–22.

Bryant was not tried or convicted for the Caldwell overdose death, about which Dalrymple testified at Bryant's sentencing hearing.  R. 125 (Sent'g Tr. at 50) (Page ID #797).  Under U.S.S.G. § 6A1.3(a), sentencing courts are permitted to "consider relevant information without regard to its

---

[9]The PSR relies on Bryant's conviction for two counts of Trafficking in a Controlled Substance (2nd Degree) to calculate the base offense level of 43.  *See* R. 114 (PSR at 41) (Page ID #717) (referencing Bryant's convictions "[a]s set forth in paragraphs #66 and #108").  At sentencing, however, the district court stated that Bryant's conviction for "Possess[ing] [a] controlled substance," *id.* ¶ 107 (Page ID #699), would also "fit as [a] similar offense[]," to which Bryant agreed, R. 125 (Sent'g Tr. at 14–15) (Page ID #761–62).

No. 23-5112, *United States v. Bryant*

admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy."  U.S.S.G. § 6A1.3(a); *see also United States v. Hunt*, 487 F.3d 347, 352 (6th Cir. 2007).  Bryant on appeal does not point to any reason why Dalrymple's testimony should be considered unreliable.  Rather, he argues that the sentencing transcript shows that the district court acted unreasonably in treating this overdose death as a "key aspect" and "likely a deciding factor" in its decision to give Bryant a life sentence. Appellant Br. at 23.

Here, Dalrymple provided testimony about events surrounding another overdose death that occurred on August 6 and 7, 2021, around two months before Cornett's death.  In reaching its sentencing decision, the district court noted the connections between Bryant and Caldwell, including the "strong objective proof" that there was a PayPal transaction between Bryant and Caldwell and the "similarity in the blood testing [of Cornett and Caldwell]."  R. 125 (Sent'g Tr. at 48–49) (Page ID #795–96).  The court noted that the testimony related to Caldwell's death was not definitive or a jury finding but considered it to be "reliable proof" and "deserv[ing] [of] consideration on the likely linkage between [] Bryant and that result."  *Id.* at 49 (Page ID #796). The court explicitly stated that the focus was on Cornett's death and the events of October 12, 2021, and noted that Bryant was not being sentenced for or convicted of Caldwell's death.  *Id.* at 50 (Page ID #797).

In addition to Dalrymple's testimony about Caldwell, the sentencing court considered other factors, including the loss of Cornett's life, the "seriousness of the offense," Bryant's history and criminal record, the "flagrant criminality" of Bryant's distributing drugs in Pod 16, and lack of deterrence Bryant seemed to have faced up until this point.  R. 125 (Sent'g Tr. at 93–105) (Page

No. 23-5112, *United States v. Bryant*

ID #840–52).   The court also recognized the trauma that Bryant had experienced and granted Bryant "treatment opportunities." *Id.* at 96–97 (Page ID #843–44).   Given that the Sentencing Guidelines and our precedent permitted the district court to consider Dalrymple's testimony about Caldwell's death earlier in August and Bryant's attempts to bring drugs into jail two additional times following Cornett's death; the fact that we are bound to apply the abuse-of-discretion standard; and the fact that the sentencing court also thoroughly took into account other factors (like Bryant's criminal history) when reaching its decision, we hold that the district court did not unreasonably rely on Dalrymple's testimony.

Next, Bryant claims that the district court erred in giving undue weight to his criminal history and argues that many of the criminal-history points assigned to him "do not arise from conduct which was particularly dangerous or egregious."  Appellant Br. at 25.   The district court discussed Bryant's criminal history and recognized that Bryant was not a "high-volume dealer" nor was he "violent" or "somebody who has been involved in guns."  R. 125 (Sent'g Tr. at 96) (Page ID #843).   However, it went on to note that Bryant had nevertheless "adher[ed] to a criminal lifestyle and that lifestyle [was] putting others in his path at great risk."  *Id.*  The district court did not abuse its discretion in taking into account the number of Bryant's convictions, in addition to whether his criminal history was overall violent in nature.

Finally, Bryant contends that he should have been treated similarly to Holbrooks, who received a sentence of twenty-six months of imprisonment, and Robinson, whose indictment in this case was dismissed with prejudice as part of his plea agreement but who received a sentence of "185 months for his involvement in an additional federal case."  Appellant Br. at 26.   Sentencing courts are permitted, but not required, to consider disparities between co-defendants.  *United States*

No. 23-5112, *United States v. Bryant*

*v. Simmons*, 501 F.3d 620, 623–24 (6th Cir. 2007).  Although not required, the district court here did note Bryant's argument at sentencing that Holbrooks and Robinson had received significantly lighter sentences than he did.  R. 125 (Sent'g Tr. at 98–99) (Page ID #845–46).  The court explained that while it understood the appeal of the argument, it viewed "[d]eath [as] a distinction here."  *Id.* at 98 (Page ID #845).  Because there was no proof that Holbrooks or Robinson had "killed somebody with his trafficking," the district court explained, it had given them lighter sentences than it was giving to Bryant.  Because the district court did not need to consider the disparities between Bryant's sentence and Holbrooks's and Robinson's sentences, and because it explained why it was treating Bryant differently, we hold that the district court did not abuse its discretion.  We affirm Bryant's sentence.

### III.  CONCLUSION

We **AFFIRM** the district court's judgment.